[No. C056072. Third Dist. Oct. 14, 2008.]

DAVID WOODS et al., Plaintiffs and Appellants, v.
MARK HORTON, as Director, etc. et al., Defendants and Respondents.

## COUNSEL

Men's Legal Center and Marc E. Angelucci for Plaintiffs and Appellants.

Edmund G. Brown, Jr., Attorney General, Douglas M. Press, Assistant Attorney General, Paul Reynaga and Roy S. Liebman, Deputy Attorneys General, for Defendants and Respondents.

## OPINION

**MORRISON, J.**—Plaintiffs, four men and the daughter of one, challenge, on equal protection grounds, several statutes administered by defendants relating to domestic violence programs and programs for inmate mothers. They contend the gender-based classifications in the statutes do not withstand a strict scrutiny analysis because the classifications are not necessary and gender-neutral alternatives are available. The trial court denied their petition for a writ of mandate, finding plaintiffs failed to show that men are similarly situated to women for purposes of the statutory schemes. The court further found that there was inadequate briefing to consider the challenge based on Proposition 209 (Cal. Const., art. I, § 31), and that plaintiffs had no standing to challenge the validity of Government Code section 11139, which grants an exception to the prohibition against discrimination on the basis of sex in benefits funded by the state for "lawful programs which benefit . . . women."

We reverse in part. We find the gender-based classifications in the challenged statutes that provide programs for victims of domestic violence violate equal protection. We find male victims of domestic violence are similarly situated to female victims for purposes of the statutory programs and no compelling state interest justifies the gender classification. We reform the affected statutes by invalidating the exemption of males and extending the statutory benefits to men, whom the Legislature improperly excluded. We further find, however, that plaintiffs have failed to show men are similarly situated to women for purposes of the prison programs for inmate mothers. We find no merit in plaintiffs' remaining contentions.

### BACKGROUND

#### *The Parties*

Plaintiffs are five individuals who have suffered domestic violence or who are suing as taxpayers to prevent the illegal expenditure of state money, or both. David Woods alleged he had been married to Ruth Woods since 1981.

Beginning in 1985, she was physically violent to him, repeatedly hitting him and attacking him with weapons and objects. In 1990 and continuing through 2003, Woods decided he and his daughter, also a plaintiff, should leave to escape the violence. He called WEAVE (Women Escaping a Violent Environment), a domestic violence service provider, and was told WEAVE did not accept men. Woods and his daughter returned to the house and the violence continued. Woods alleged the violence may continue and he still needs services. Woods's daughter alleged she was injured by the denial of services to her father, which forced her to witness and be subjected to continued violence.

Gregory Bowman alleged he is a taxpayer in California. He alleged his former girlfriend repeatedly assaulted him. On May 11, 2005, he received threats from the girlfriend, who gave him a black eye. He reported the incident to the police. On several occasions during that time Bowman needed domestic violence services. He requested them from numerous state-funded programs, but was frequently denied services because he was a man. These programs are not identified by name. One organization referred Bowman to the National Coalition of Free Men, Los Angeles chapter (NCFM-LA), and he contacted NCFM-LA for assistance. Ray Blumhorst, on behalf of Bowman, contacted the Women's Health Center of Excellence (WHCE) in the King Drew Medical Center and was told WHCE offers services only to women. Shortly thereafter, Marc Angelucci, plaintiffs' attorney, contacted two county supervisors about whether WHCE provided domestic violence services for men. Only one responded, reporting that King Drew Medical Center did not offer services to men. Other, unidentified, state-sponsored services turned down Bowman based on his sex.

Bowman alleged his former girlfriend stabbed him, and she was arrested and charged with assault with a deadly weapon and domestic assault. She and others continued to threaten and harass Bowman, including smashing his windshield, stealing his license plates and leaving a suspicious package in his car. Bowman alleged he still needs domestic violence services and is denied them based on his gender.

Patrick Neff alleged that from 2001 through 2004, his former girlfriend repeatedly assaulted him and he needed to get out of the house and receive counseling and legal advice. He had no money. He repeatedly called the Domestic Violence and Sexual Assault Coalition (DVSAC) but was told they do not help men. In 2001, the violence exploded and Neff was arrested and charged and he pled no contest to domestic violence. He maintained his innocence and alleged he still needed domestic violence services.[1]

---

[1] Before this matter was heard in the trial court, Neff died.

Blumhorst alleged he was a taxpayer and that by administering the challenged statutory programs according to gender classifications, defendants were illegally spending state money.

Defendants are the State of California and the agencies and their directors who administer the challenged programs: the Department of Health Services (DHS),[2] the Office of Emergency Services (OES), and the Department of Corrections (now the Dept. of Corrections and Rehabilitation) (CDCR).

### The Challenged Statutes

Plaintiffs challenge a number of statutory provisions that have gender-based classifications. In particular, they challenge programs that provide benefits for women and their children, but not men and their children. They contend these gender-based classifications violate equal protection, Proposition 209, and Government Code section 11135 and its implementing regulations (Cal. Code Regs., tit. 22, § 98100 et seq.). We begin by describing the challenged statutory schemes.

### Domestic Violence Programs

Plaintiffs challenge two statutory programs providing grants to those providing services for victims of domestic violence. The first is a comprehensive shelter-based grant program to battered women's shelters to be administered by the Maternal and Child Health Branch of the DHS. (Health & Saf. Code, § 124250.) The program provides grants to battered women's shelters that provide services in four areas: emergency shelter to women and their children, transitional housing programs to assist in finding housing and jobs, legal and other types of advocacy and representation, and other support services. (*Id.*, subd. (c).) The statute defines domestic violence as occurring only against women. " 'Domestic violence' means the infliction or threat of physical harm against past or present adult or adolescent female intimate partners, and shall include physical, sexual, and psychological abuse against the woman, and is part of a pattern of assaultive, coercive, and controlling behaviors directed at achieving compliance from or control over, that woman."[3] (§ 124250, subd. (a)(1).) The statute speaks in gender-specific terms; services are to be provided to "women and their children." (*Id.*, subds. (a)(2), (3), (c)(1), (d)(1), (g)(1).)

---

[2] Effective July 1, 2007, the DHS was reorganized into the State Department of Health Care Services and the State Department of Public Health (DPH). (*People ex rel. Brown v. PuriTec* (2007) 153 Cal.App.4th 1524, 1528, fn. 1 [64 Cal.Rptr.3d 270].) The DPH administers the challenged program. For the sake of ease and consistency, we shall refer to the administering agency as DHS, as the parties do.

[3] Although the statute speaks only of battered women and their children, it does provide: "It is the intent of the Legislature that services funded by this program include services for

The second program is the Comprehensive Statewide Domestic Violence Program administered by the OES. (Pen. Code, § 13823.15.) "The Legislature finds the problem of domestic violence to be of serious and increasing magnitude. The Legislature also finds that existing domestic violence services are underfunded and that some areas of the state are unserved or underserved. Therefore, it is the intent of the Legislature that a goal or purpose of the Office of Emergency Services (OES) shall be to ensure that all victims of domestic violence served by the OES Comprehensive Statewide Domestic Violence Program receive comprehensive, quality services." (*Id.*, subd. (a).) The OES provides financial and technical assistance to local domestic violence centers in implementing a variety of services, including 24-hour crisis hotlines, emergency "safe" homes or shelters, emergency services, counseling, and advocacy. Priority is given to "emergency shelter programs and 'safe' homes for victims of domestic violence and their children." (*Id.*, subd. (b)(14).)

The language of Penal Code section 13823.15 is gender neutral, referring to "victims of domestic violence" rather than women, except in subdivision (f), which addresses the funding process for grants to domestic violence shelter service providers. For purposes of that subdivision, domestic violence is defined as "the infliction or threat of physical harm against past or present adult or adolescent female intimate partners, including physical, sexual, and psychological abuse against the woman, and is a part of a pattern of assaultive, coercive, and controlling behaviors directed at achieving compliance from or control over that woman." (*Id.*, subd. (f)(15)(A).) The program is administered by OES and an advisory panel; at least one-half of the panel shall be domestic violence victims' advocates or battered women service providers. (Pen. Code, § 13823.16, subd. (b).)

## Programs for Inmate Mothers

Two programs for inmate mothers are challenged. Penal Code section 1174 et seq. sets forth the Pregnant and Parenting Women's Alternative Sentencing Program Act (PPWASPA). The act funds community-based facilities for programs designed to reduce drug use and recidivism. (Pen. Code, § 1174.2.) Those eligible for this alternative sentencing program are women prisoners who are pregnant or are parents of one or more children under the age of six, who have a history of substance abuse, have not been convicted of certain specified crimes, and have been sentenced to prison for a term of not

---

battered women in underserved communities, including the lesbian, gay, bisexual, and transgender community, and ethnic and racial communities." (Health & Saf. Code, § 124250, subd. (h).)

more than 36 months. (Pen. Code, § 1174.4, subd. (a).) For women with children, at least one eligible child shall reside with the mother at the facility. (*Id.*, subd. (a)(1).) Prior to sentencing, the court determines not only whether the woman is eligible and amenable to treatment for substance abuse, but whether the program is in the best interests of the child. (*Id.*, subd. (b).)

The second program, set forth at Penal Code section 3410 et seq., provides for a community treatment program for women inmates sentenced to state prison who have one or more children under the age of six. An incarcerated mother is eligible for the program if she has a probable release or parole date with a maximum period of confinement not exceeding six years; she was the primary caretaker of the infant prior to incarceration; she has not been found to be an unfit parent; and she does not pose an unreasonable risk to the public due to the nature of her crime, the risk of absconding, or probable adverse conduct. (Pen. Code, § 3417.) Eligible women are released to a facility in the community suitable for the needs of mother and child or children. The primary concern is "the establishment of a safe and wholesome environment for the participating children." (Pen. Code, § 3411.) The program also provides pediatric, prenatal, and child birth care. (Pen. Code, §§ 3419, 3423, 3424.)

### Government Code Section 11139

Government Code section 11135, subdivision (a) sets forth a nondiscrimination policy for state programs. It provides: "No person in the State of California shall, on the basis of race, national origin, ethnic group identification, religion, age, sex, sexual orientation, color, or disability, be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is conducted, operated, or administered by the state or by any state agency, is funded directly by the state, or receives any financial assistance from the state."

Government Code section 11139 provides certain exceptions to the nondiscrimination policy. It reads in part: "This article shall not be interpreted in a manner that would adversely affect lawful programs which benefit the disabled, the aged, minorities, and women." Plaintiffs challenge this gender classification.

### The Petition for Writ of Mandate

Plaintiffs filed a complaint for injunctive and declaratory relief and a petition for a writ of mandate. The second amended complaint and petition alleged the statutory gender classifications set forth in the statutes

above violated equal protection under article I, section 7 of the California Constitution, Proposition 209 (Cal. Const., art. I, § 31), Government Code section 11135, and section 98100 et seq. of title 22 of the California Code of Regulations, which regulations implement the provisions of Government Code section 11135. Plaintiffs sought a declaration that the gender classifications were unlawful, reformation of the statutes to gender-neutral language, and injunctive relief to stop the illegal funding of services only to women and to require providing services to men.

Plaintiffs contended they had standing as taxpayers, citizens, and aggrieved parties. Relying on *Connerly v. State Personnel Bd.* (2001) 92 Cal.App.4th 16 [112 Cal.Rptr.2d 5] (*Connerly*), which held certain affirmative action programs violated equal protection and Proposition 209, they argued the gender classifications were subject to strict scrutiny and the classifications were not necessary because similar laws in other states were gender neutral.

In support of the petition for a writ of mandate, plaintiffs offered declarations from several experts with Ph.D.'s in psychology and sociology and other experts on domestic violence attesting that men suffered from domestic violence as well as women and were in need of domestic violence services. The declarants stated studies showed women used violence in intimate relationships at about the same rate as men, although women victims suffered greater injuries. Denying services to abused men put their children in danger. Plaintiffs also provided several articles discussing the prevalence of domestic violence against men.[4]

Plaintiffs also provided expert declarations and articles stressing the importance of maintaining the father-child bond for incarcerated fathers. Aida Camero, the jail support services manager at the Bexar County Adult Detention Center in San Antonio, Texas, described visitation programs for incarcerated parents—MATCH (Mothers And Their Children) and PATCH (Papas And Their Children)—and the programs' success in improving the

---

[4] Plaintiffs also submitted a tape recording of calls by their attorney to various shelters seeking help for a man. They assert the tape documents the gender discrimination of these shelters. Unfortunately, the tape is of poor quality and due to excessive feedback is unintelligible in part. In several calls, Angelucci is told the only shelter that accepts men is Valley Oasis in Lancaster and certain shelters do not provide counseling and court advocacy services for men. One of the shelters Angelucci called is Haven Hills. In the opening brief, plaintiffs assert Haven Hills is state funded and denies services to men, citing page 14 of the appendix. The record does not support this assertion; page 14 makes no mention of Haven Hills and the entity is not a party to the lawsuit. There is no evidence in the record that Haven Hills is funded by either program at issue. In fact, the only evidence that some state-funded programs discriminate against men is the declaration of Dr. Susann Steinberg that 85 percent of agencies funded by DHS provide services to men, from which we presume the other 15 percent do not.

lives of both incarcerated parents and their children. The MATCH/PATCH programs provided "progressive programming and education." Incarcerated parents could earn a one-hour contact visit each week with their children.

Plaintiffs also submitted responses to interrogatories and requests for admissions from the state agencies. DHS denied that battered men were always similarly situated to battered women. Studies by the Department of Justice indicated women were more likely to be victims of domestic violence. OES did not implement any of the challenged programs under Health and Safety Code section 124250, Government Code section 11139, or Penal Code sections 3411 et seq. and 1174 et seq. Further, OES required agencies it did fund to provide services to victims of domestic violence regardless of gender.

CDCR responded that the Penal Code programs for incarcerated mothers did not mention fathers, so men were not eligible for them. Incarcerated fathers were not similarly situated to incarcerated mothers because mothers were more likely to assume the caretaker status for young children. Institutional visitation programs were gender neutral; programs were expanded to meet the differing needs of the inmate population.

Defendants' opposition took exception to several facts alleged by plaintiffs. Supported by discovery responses, defendants asserted that WEAVE and DVSAC provided domestic violence services to men; both entities had been dismissed as defendants. WHCE did not provide domestic violence services to anyone, male or female, and Los Angeles County had been dismissed as a defendant.

Dr. Steinberg, the public health medical administrator for DHS, declared that all shelters receiving grants from OES offer gender-neutral services.[5] Of the agencies funded by DHS, 85 percent offer services to men as well as women. Research showed women have a greater need for shelters than men and there were insufficient resources to provide for all domestic violence victims.

Wendy Still, associate director of CDCR, declared that prison programs recognized the differences between male and female inmates. Most female inmates were convicted of drug or property crimes, were often victims of abuse,

---

[5] This was confirmed by Ann Mizoguchi, a staff services manager for OES. For grants, OES required domestic violence services to be inclusive of all victims regardless of gender to comply with federal law. For example, the Omnibus Crime Control and Safe Streets Act of 1968, as amended, prohibits exclusion on the basis of sex from participation in or denial of benefits of "any programs or activity funded in whole or in part with funds made available under this chapter." (42 U.S.C. § 3789d(c)(1).)

and were more likely to be single parents. The programs were gender responsive. There was only a small percentage of male primary caretakers. There were other programs for men, such as a third-day visitation program. Still declared the PPWASPA (Pen. Code, § 1174 et seq.) was adopted as a counterpart for male offenders to the California Alternative Sentencing Program.[6]

Still detailed the two programs. The PPWASPA (Pen. Code, § 1174 et seq.) currently had two facilities, each housing up to 35 women and 40 children, and offered a highly structured substance abuse program, including parenting training, and education, employment and life skills training. The Community Prisoner Mother Program (Pen. Code, § 3411 et seq.) had been in existence since 1985 and currently had 71 inmates in three facilities. Its primary purpose was to strengthen the family unit and it addressed substance abuse, emotional, stability, self-esteem and employment issues.

In reply, plaintiffs offered additional declarations attesting to the need for domestic violence shelters for men and programs for inmate fathers.

### Trial Court Ruling

The trial court denied the petition. It declined to address the challenge under Proposition 209 because plaintiffs provided inadequate briefing on the issue. The court found plaintiffs had standing as taxpayers to challenge the facial constitutionality of all the statutes except Government Code section 11139. The court read *Blumhorst v. Jewish Family Services of Los Angeles* (2005) 126 Cal.App.4th 993 [24 Cal.Rptr.3d 474] (*Blumhorst*), as requiring actual injury for standing to challenge the constitutionality of Government Code section 11139, and found plaintiffs had alleged only past injury.

The court found plaintiffs failed to show that male domestic violence victims were similarly situated to female domestic violence victims. Legislative findings indicated the problem of domestic violence against females was increasing and existing services were underfunded and certain areas underserved. The court found ample support for these findings, as women were more likely to be victims and sustain more severe injuries. Plaintiffs failed to show a similarly severe unmet need for male victims of domestic violence. They had not identified any provider that offered services to women but not to men.

---

[6] This pilot program (Pen. Code, former § 1173 et seq.) provided discipline, rehabilitation, and educational services for certain first-time offenders. It did not include a provision for the inmates' children. The program was repealed effective 1998. (Stats. 1992, ch. 1063, p. 4942.)

The court also found plaintiffs failed to establish that prison fathers were similarly situated to prison mothers. The data showed women were more likely than men to be caretakers of young children and that other approaches, such as extended visitation, were more appropriate for men.

## DISCUSSION

### I. *Failure to Apply Equal Protection Analysis to Gender-based Classifications*

In denying the petition, the trial court found plaintiffs failed to meet the prerequisite of an equal protection claim. They did not show that male domestic violence victims and inmate fathers are similarly situated to female domestic violence victims and inmate mothers.

Plaintiffs contend the trial court erred in failing to apply a strict scrutiny equal protection analysis to the gender classifications. They stress that equal protection applies to individuals, not groups. "In applying the strict scrutiny test, it must be remembered that the rights created by the equal protection clause are not group rights; they are personal rights which are guaranteed to the individual." (*Connerly, supra*, 92 Cal.App.4th at p. 35.) Plaintiffs contend many men are similarly situated to women with respect to domestic violence and prison programs for parents.

■ " ' "The concept of the equal protection of the laws compels recognition of the proposition that persons similarly situated with respect to the legitimate purpose of the law receive like treatment." ' [Citation.]" (*In re Eric J.* (1979) 25 Cal.3d 522, 531 [159 Cal.Rptr. 317, 601 P.2d 549].) "The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner. [Citation.]" (*Id.* at p. 530.) The use of the term "similarly situated" in this context refers only to the fact that " '[t]he Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same.' [Citations.]" (*In re Roger S.* (1977) 19 Cal.3d 921, 934 [141 Cal.Rptr. 298, 569 P.2d 1286].)

"The 'similarly situated' prerequisite simply means that an equal protection claim cannot succeed, and does not require further analysis, unless there is some showing that the two groups are sufficiently similar with respect to the purpose of the law in question that some level of scrutiny is required in order to determine whether the distinction is justified." (*People v. Nguyen* (1997) 54 Cal.App.4th 705, 714 [63 Cal.Rptr.2d 173].)

The similarly situated prerequisite applies when the classification is by gender. (*Amy G. v. M.W.* (2006) 142 Cal.App.4th 1, 17 [47 Cal.Rptr.3d 297]; *In re Shereece B.* (1991) 231 Cal.App.3d 613, 623 [282 Cal.Rptr. 430] [finding men and women not similarly situated as to birth process].)

The Attorney General contends the trial court's finding that men and women are not similarly situated for purposes of the statutes at issue is supported by substantial evidence. We examine those findings.

### Domestic Violence Programs

The trial court found the purpose of both grant programs, Penal Code section 13823.15 and Health and Safety Code section 124250, was to provide funding for new and existing domestic violence services for female victims. It found this purpose was based on legislative findings that domestic violence against women was of serious and increasing magnitude, citing subdivision (a) of Penal Code section 13823.15. As noted above, section 13823.15 uses gender-neutral language—"victims of domestic violence"—except in subdivision (f), which addresses funding the grants. Nothing indicates the Legislature found the problem of domestic violence was increasing and severe only where the victims were female. Moreover, as discussed above, the evidence indicates that all programs funded by OES pursuant to Penal Code section 13823.15 provide services on a gender-neutral basis. In implementation, therefore, Penal Code section 13823.15 addresses domestic violence regardless of the gender of the victim.

The trial court's reasoning is that since more women are victims of domestic violence, and since they suffer more severe injuries, men are not similarly situated for purposes of domestic violence services. As plaintiffs argue, this analysis improperly views equal protection rights as group rights, rather than individual rights, and permits discrimination simply because fewer men than women are affected. (See *Connerly, supra*, 92 Cal.App.4th at p. 35.) The trial court recognized that plaintiffs established, through declarations and journal articles, "that men experience significant levels of domestic violence as victims." These men, therefore, are similarly situated to women as to the need for domestic violence services. The trial court erred in finding the similarly situated prerequisite had not been met for the domestic violence programs.

### Programs for Inmate Mothers

The trial court found the purposes of the alternative sentencing program under Penal Code section 1174 et seq. and the community treatment program under Penal Code section 3410 et seq. are to foster the mother-child bond, the

healthy development of children, and the rehabilitation of inmate mothers. Enactment of these programs coincided with a dramatic increase in the number of female inmates, many of whom were imprisoned for nonviolent drug and property offenses, had used drugs before incarceration, and were victims of abuse. These characteristics made them suitable for low-security, community-based treatment programs. Government data showed these women prisoners were likely to have been the primary or sole caretaker of their young children, who were likely to be displaced to other relatives or foster care. By contrast, children of incarcerated men were likely to continue living with their mothers.

Plaintiffs fail to identify a single inmate father who would qualify for these programs, but was denied his benefit due to his gender. Instead, they rely on statistics from a 1997 California Research Bureau, California State Library report to support their argument that inmate fathers are similarly situated to inmate mothers. The report indicated inmate fathers outnumber inmate mothers by more than 10 to one (84,013 fathers and 6,241 mothers). Plaintiffs claim 29 percent of inmate fathers had children who were not cared for by another parent.[7] Plaintiffs conclude these statistics show the number of sole caretaker fathers in prison is comparable to the number of sole caretaker mothers. The statistics do not prove the assertion because they do not show the inmate fathers were primary caretakers before incarceration. The child could have been cared for by a grandparent who was the primary caretaker even before the father was incarcerated.

More importantly, plaintiffs fail to show that inmate fathers are similarly situated to inmate mothers for purposes of the programs at issue. At oral argument, plaintiffs expressed certainty that there were men who qualified for the programs. We are less certain. Unlike the domestic violence programs, which offer a variety of services to "victims of domestic violence" or "battered women and their children," the prison programs have more exacting eligibility requirements. To qualify, inmate mothers must have children of certain ages, have prison terms of limited duration, not have been convicted of certain crimes, and meet other requirements, such as being the primary caretaker of the child. Further, there are more subjective requirements, such as the inmate's being amenable to treatment and, most importantly, that the program be in the child's best interest.

---

[7] This statistic misstates the report. The report states most inmate fathers (85 percent) reported having at least one child cared for by the child's mother or stepparent, while this was true for only 29 percent of inmate mothers.

██ We are mindful that courts should accord deference to the appropriate prison officials in the complex area of prison administration. (*Turner v. Safley* (1987) 482 U.S. 78, 84–85 [96 L.Ed.2d 64, 76, 107 S.Ct. 2254].) "Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are particularly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint." (*Ibid.*) Subjecting the judgment of prison officials to inflexible judicial review "would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration." (*Id.* at p. 89.)

In considering plaintiffs' challenge to prison programs not available to male inmates, we find *Klinger v. Department of Corrections* (8th Cir. 1994) 31 F.3d 727 instructive. There, inmates at Nebraska's only women's prison brought a class action alleging they were denied equal protection because their programs were inferior to those offered at the men's prison. The Eighth Circuit Court of Appeals, noting that the plaintiffs were not challenging the equality of funding, framed the plaintiffs' claim as "that the Constitution requires the Department to allocate resources and select programming at [the women's prison] like it allocates resources and selects programming at [the men's prison]." (*Id.* at p. 731.) The court found the female inmates were not similarly situated to male inmates for purposes of these programs, noting the differences in the size of the prisons, the average length of stay, and security levels. Further, the two populations had different characteristics; female inmates were more likely to be single parents with primary responsibility for children and victims of sexual or physical abuse, while male inmates were more likely to be violent and predatory. (*Id.* at p. 732.)

These same considerations of the differences between male and female inmates informed the adoption of the programs here at issue. The declaration of the associate director of CDCR states the programs are gender responsive, "taking into account the ways in which women prisoners present differently from men prisoners." The declaration reports different programs are developed to address the prisoners' needs, such as third-day visiting for male inmate fathers and transportation services for families of female inmates. Plaintiffs have failed to show the needs of inmate fathers are not met.

Given the absence of a showing of any inmate father who qualifies for a program and was denied its benefits, the deference accorded prison officials

in developing such programs, the separation of powers concerns in encroaching on executive and legislative determinations, and the differences between male and female inmates, the trial court did not err in finding male and female inmates are not similarly situated for the purposes of the programs for inmate mothers. (See *Women Prisoners of D.C. Correct. v. D.C.* (D.C. Cir. 1996) 320 U.S. App.D.C. 247 [93 F.3d 910, 927] [rejecting equal protection claim based on differences in treatment of male and female inmates].)

## II. *Strict Scrutiny Analysis*

Plaintiffs contend the challenged programs do not survive strict scrutiny analysis because the gender classifications are unnecessary and there are gender-neutral alternatives available. As to the domestic violence programs only, we agree.

■ Plaintiffs base their equal protection challenge on section 7, subdivision (a) of article I of the California Constitution, which provides in part: "A person may not be . . . denied equal protection of the laws . . . ." Under California law, a classification based on gender is considered "suspect" for purposes of an equal protection analysis. (*Sail'er Inn, Inc. v. Kirby* (1971) 5 Cal.3d 1, 17–20 [95 Cal.Rptr. 329, 485 P.2d 529].) "In short, public policy in California mandates the *equal* treatment of men and women." (*Koire v. Metro Car Wash* (1985) 40 Cal.3d 24, 37 [219 Cal.Rptr. 133, 707 P.2d 195].)

■ The requirements of a strict scrutiny equal protection analysis for a suspect classification are set forth in *Connerly, supra,* 92 Cal.App.4th 16. "Because suspect classifications are pernicious and are so rarely relevant to a legitimate governmental purpose [citation], they are subjected to strict judicial scrutiny; i.e., they may be upheld only if they are shown to be necessary for furtherance of a compelling state interest and they address that interest through the least restrictive means available. [Citations.]" (*Id.* at p. 33.)

"The complaining party bears the initial and ultimate burden of establishing unconstitutionality." (*Connerly, supra,* 92 Cal.App.4th at p. 43.) When the challenged statutory scheme employs express gender classifications, a plaintiff meets his or her burden by pointing that out. (*Ibid.*)

"Under the strict scrutiny test, governmental specificity and precision are demanded. The mere recitation of a benign or legitimate purpose is entitled to little or no weight. . . . Moreover, generalized assertions of purpose are

insufficient since they provide little or no guidance for the legislative body to narrowly tailor its use of a suspect classification and because they inhibit judicial review under the strict scrutiny test. [Citation.]" (*Connerly, supra*, 92 Cal.App.4th at p. 36.)

"Once a compelling interest is shown, the inquiry focuses on the means chosen to address the interest. It is not enough that the means chosen to accomplish the purpose are reasonable or efficient. [Citation.] Only the most exact connection between justification and classification will suffice. [Citations.] The classification must appear necessary rather than convenient, and the availability of nonracial [or gender-neutral] alternatives—or the failure of the legislative body to consider such alternatives—will be fatal to the classification. [Citation.]" (*Connerly, supra*, 92 Cal.App.4th at p. 37.)

### Domestic Violence Programs

The Attorney General contends there is a compelling state interest in funding domestic violence programs only for women and cites the legislative findings relied on by the trial court of the increase in domestic violence. The legislative findings are those in Penal Code section 13823.15, subdivision (a). As noted above, that subdivision does not have a gender classification and its gender-neutral implementation shows none is necessary. The only basis suggested for a more compelling state interest in preventing domestic violence against women than men is that women are more often victims and suffer more severe injuries.

The greater need for services by female victims of domestic violence does not provide a compelling state interest in a gender classification. As *Connerly* makes clear, equal protection is not concerned with numbers. "In applying the strict scrutiny test, it must be remembered that the rights created by the equal protection clause are not group rights; they are personal rights which are guaranteed to the individual." (*Connerly, supra*, 92 Cal.App.4th at p. 35.) Arguing that a group of people (here male victims of domestic violence) is too small in number to be afforded equal protection is simply arguing "that the right to equal protection should hinge on 'administrative convenience.' " (*Molar v. Gates* (1979) 98 Cal.App.3d 1, 18 [159 Cal.Rptr. 239].) Administrative convenience is an inadequate state interest under a strict scrutiny analysis. (*Id.* at p. 17.) Plaintiffs and defendants agree domestic violence is a serious problem for both women and men, and programs funded under Health and Safety Code section 124250 and Penal Code section

13823.15 offer a variety of services, primarily shelter but also counseling and other support services. Defendants fail to show a compelling state interest in providing funding only to those programs that provide these services to women only.

Even if there were a compelling state interest, defendants do not show the classification is necessary, rather than convenient, and no gender-neutral alternative is available. Most of the programs funded by DHS and all of the programs funded by OES offer services on a gender-neutral basis, showing the classification is not necessary. There is an alternative; most statutory definitions of domestic violence are gender neutral. (See, e.g., Fam. Code, § 6211 [adopted by reference in Code Civ. Proc., § 128, subd. (e)]; Evid. Code, § 1037.7; Gov. Code, § 6205.5, subd. (b); Health & Saf. Code, § 1374.75, subd. (c); Ins. Code, §§ 676.9, subd. (f), 10144.2, subd. (c), 10144.3, subd. (d); Lab. Code, § 230, subd. (h)(1); Pen. Code, §§ 277, subd. (j), 12028.5, subd. (a)(2), 13700, subd. (b) [adopted by reference in Civ. Code, § 1708.6, subd. (a)(1), (2)]; Welf. & Inst. Code, § 18291, subd. (a).)

■ The gender classifications in the domestic violence programs are not necessary to further a compelling state interest. Where, as here, the state's purposes "are as well served by a gender-neutral classification as one that gender classifies and therefore carries with it the baggage of sexual stereotypes, the State cannot be permitted to classify on the basis of sex." (*Orr v. Orr* (1979) 440 U.S. 268, 283 [59 L.Ed.2d 306, 321, 99 S.Ct. 1102].) The gender classifications in Health and Safety Code section 124250 and Penal Code section 13823.15, that provide state funding of domestic violence programs that offer services only to women and their children, but not to men, violate equal protection.

### III. Failure to Address Proposition 209 Challenge

Plaintiffs contend the trial court erred in refusing to consider their challenge based on Proposition 209.[8] We find no error because plaintiffs failed to adequately brief the issue.

---

[8] The failure to consider the Proposition 209 challenge may be significant because Proposition 209 "prohibits discrimination against or preferential treatment to individuals or groups regardless of whether the governmental action could be justified under strict scrutiny." (*Connerly, supra*, 92 Cal.App.4th at p. 42.) "To the extent the federal Constitution would permit, but not require, the state to grant preferential treatment to suspect classes, Proposition 209 precludes such action. [Citation.]" (*Id.* at pp. 42–43.) The failure to consider plaintiffs' Proposition 209 challenge is not significant here because we have not found any preferential treatment that is justified under strict scrutiny.

At the November 1996 general election, the electorate adopted Proposition 209 which added article I, section 31 to the California Constitution. Proposition 209 provides in part: "The State shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting." (Cal. Const., art. I, § 31, subd. (a).)

Plaintiffs' petition and complaint alleged that directing public funds according to the gender classifications in the challenged statutes violated Proposition 209. Their opening brief in support of the petition states governmental sex discrimination is unlawful under sections 7, subdivision (a) and 31 of article I of the California Constitution and the gender classifications violate these provisions. There is no discussion of the terms of Proposition 209 or how the grants to domestic violence and inmate mother programs fall within the "operation of public employment, public education, or public contracting." (Cal. Const., art. I, § 31, subd. (a).)

A court need not consider an issue where reasoned, substantial argument and citation to supporting authorities are lacking. (*Addam v. Superior Court* (2004) 116 Cal.App.4th 368, 373 [10 Cal.Rptr.3d 39]; *People v. Gray* (1998) 66 Cal.App.4th 973, 994 [78 Cal.Rptr.2d 191].) The mere assertion of a statutory or constitutional violation, followed by simply a citation to the statute or constitutional provision, does not merit a judicial response. (*Independent Roofing Contractors v. California Apprenticeship Council* (2003) 114 Cal.App.4th 1330, 1339 [9 Cal.Rptr.3d 477].) Plaintiffs' failure to develop their Proposition 209 argument is fatal. (*Kennedy v. Superior Court* (2006) 145 Cal.App.4th 359, 378 [51 Cal.Rptr.3d 637].)

Plaintiffs argue they adequately raised a Proposition 209 challenge. They note that this court in *Connerly, supra,* 92 Cal.App.4th 16, addressed equal protection and Proposition 209 together without separating them. Nothing in *Connerly,* however, indicates the Proposition 209 argument was as cursory as that here. Moreover, the programs at issue in *Connerly* were clearly public employment, public education and public contracting; that is not the case here.

## IV. *Taxpayer Standing to Challenge Validity of Government Code Section 11139*

Plaintiffs contend the trial court erred in finding they did not have standing as citizens or taxpayers to challenge the constitutional validity of Government Code section 11139. The trial court relied on *Blumhorst, supra,* 126 Cal.App.4th 993, which held a plaintiff bringing an action under Government Code sections 11135 or 11139 must allege actual injury and there was no

relaxed standing based on public interest. Plaintiffs contend *Blumhorst* is inapposite because it did not address citizen or taxpayer standing. Further, they contend *Blumhorst* was wrongly decided.

We need not address this issue because a challenge to Government Code section 11139 is unnecessary to this case. Government Code section 11139 provides the nondiscrimination policy set forth in Government Code section 11135 shall not "adversely affect lawful programs which benefit . . . women." Plaintiffs contend the challenged statutory programs violate the nondiscrimination provisions of Government Code section 11135 and that such programs cannot be saved by Government Code section 11139. As discussed above, plaintiffs have failed to show the prison programs for inmate mothers discriminate in favor of women, because they have not shown men and women are similarly situated for purposes of these programs and they have not shown any man was denied benefits on the basis of sex. We have found that the programs funded by Penal Code section 13823.15 and Health and Safety Code section 124250, limiting the services provided by such programs to only women and their children, do violate equal protection. Since such restrictions are unconstitutional, it adds nothing to plaintiffs' case to also find they violate Government Code section 11135. Nor can they be saved by Government Code section 11139 because, to the extent the programs are implemented in a gender-restrictive manner, they are unconstitutional and not "lawful programs." (Gov. Code, § 11139.)

## V.  *Remedy for Violation of Equal Protection*

We turn now to the question of the appropriate remedy for the violation of equal protection due to the gender classifications in the challenged domestic violence programs. Because the Attorney General did not address the issue in his brief, we requested supplemental briefing on the issue from both parties.

■ In framing a remedy for an equal protection violation, courts have wide discretion. (See *Crawford v. Board of Education* (1976) 17 Cal.3d 280, 305–307 [130 Cal.Rptr. 724, 551 P.2d 28].) A court may revise a statute to avoid constitutional problems "if we conclude that the Legislature's intent clearly would be furthered by application of the revised version rather than by the alternative of invalidation." (*People v. Sandoval* (2007) 41 Cal.4th 825, 844 [62 Cal.Rptr.3d 588, 161 P.3d 1146], fn. omitted.)

"When a statute's differential treatment of separate categories of individuals is found to violate equal protection principles, a court must determine whether the constitutional violation should be eliminated or cured by extending to the previously excluded class the treatment or benefit that the statute affords to the included class, or alternatively should be remedied by withholding the benefit equally from both the previously included class and the

excluded class. A court generally makes that determination by considering whether extending the benefit equally to both classes, or instead withholding it equally, would be most consistent with the likely intent of the Legislature, had that body recognized that unequal treatment was constitutionally impermissible. [Citations.]" (*In re Marriage Cases* (2008) 43 Cal.4th 757, 856 [76 Cal.Rptr.3d 683, 183 P.3d 384].)

"A statutory classification which arbitrarily excludes some but not all of those similarly situated in relation to the legitimate purposes of the statute does not necessarily invalidate the entire statute. [Citations.] In light of the purposes and history of a particular statute or an overall statutory scheme a reviewing court may correct a discriminatory classification by invalidating the invidious exemption and thus extending statutory benefits to those whom the Legislature unconstitutionally excluded." (*Hayes v. Superior Court* (1971) 6 Cal.3d 216, 224 [98 Cal.Rptr. 449, 490 P.2d 1137].)

Both plaintiffs and the Attorney General agree that reforming Health and Safety Code section 124250 and Penal Code section 13823.15 to provide funding for victims of domestic violence regardless of gender would be preferable to invalidating the statutes. Both agree the clear legislative intent was to provide funding for programs offering services to victims of domestic violence. This intent is expressed in the opening language of subdivision (a) of Penal Code section 13823.15: "The Legislature finds the problem of domestic violence to be of serious and increasing magnitude. The Legislature also finds that existing domestic violence services are underfunded and that some areas of the state are unserved or underserved."

Nothing in either statute evinces a legislative intent to restrict funding to programs that assist only women. Indeed, all of the programs funded under Penal Code section 13823.15 and the vast majority, 85 percent, of the programs funded under Health and Safety Code section 124250 provide services on a gender-neutral basis. Accordingly, both Health and Safety Code section 124250 and Penal Code section 13823.15 are hereby reformed to provide funding for services to victims of domestic violence, regardless of gender.

In reforming the statutes that provide funding for domestic violence programs to be gender neutral, we do not require that such programs offer identical services to men and women. Given the noted disparity in the number of women needing services and the greater severity of their injuries, it may be appropriate to provide more and different services to battered women and their children. For example, a program might offer shelter for women, but only hotel vouchers for a smaller number of men.

## DISPOSITION

The judgment is reversed. We direct judgment be entered for the issuance of a peremptory writ of mandate commanding (1) the DPH to provide any grants under Health and Safety Code section 124250 to those organizations that provide services to victims of domestic violence, regardless of gender; and (2) the OES to provide grants under Penal Code section 13823.15 to those organizations that provide services to victims of domestic violence, regardless of gender. Plaintiffs shall recover costs on appeal. (Cal. Rules of Court, rule 8.278(a)(3).)

Raye, Acting P. J., and Cantil-Sakauye, J., concurred.

Appellants' petition for review by the Supreme Court was denied December 23, 2008, S168367. Werdegar, J., did not participate therein.